[Cite as *Gordon v. Ohio State Univ. Med. Ctr.*, 2010-Ohio-5689.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROBERT GORDON, Admr., etc., et al.

    Plaintiffs

    v.

OHIO STATE UNIVERSITY MEDICAL CENTER, et al.

    Defendants
    Case No. 2007-03471

Judge Clark B. Weaver Sr.

DECISION

{¶ 1} Plaintiff, Robert Gordon, administrator of the estate of Lola McKinney, brought this action alleging claims of wrongful death and medical negligence. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} On October 18, 2005, Lola McKinney began serving a sentence of incarceration at the Ohio Reformatory for Women (ORW). She was 39 years old and suffering from end-stage renal disease, hypertension, and a seizure disorder. As a result of the renal disease, McKinney required hemodialysis three times per week, a schedule that she had followed for more than ten years prior to her incarceration. While in custody, McKinney was transported for dialysis each Monday, Wednesday, and Friday at Frazier Health Center, a part of the Pickaway Correctional Institution.

{¶ 3} On or about November 6, 2005, McKinney experienced some dizziness and fell two times while at ORW. She reported to staff that she had hit her head and felt pain in her head, as well as in her right shoulder, arm, and wrist. The next day,

November 7, 2005, when she would have been transported for dialysis, she was instead taken to a local emergency room at Union Memorial Hospital (UMH) where she was evaluated by the attending physician, Matthew Sanders, D.O. According to Dr. Sanders, McKinney arrived on a backboard with a cervical collar in place. She denied that she had experienced any seizure activity in conjunction with her falls. Dr. Sanders ordered a CT scan of McKinney's head, x-rays of her neck, chest, right arm, and wrist, an EKG, and laboratory studies. There were no significant findings from the CT scan or x-rays. However, a blood sample that was drawn at 11:10 a.m. revealed a high level of potassium, 7.4,[1] in McKinney's blood serum, a condition known as hyperkalemia. In addition, the EKG depicted abnormal T-waves, an indication that McKinney's heart rhythm was being affected by her elevated potassium level. At approximately 12:15 p.m., several medications were administered to temporarily correct the elevated blood serum potassium. At 1:00 p.m., a repeat EKG was performed that showed slightly less irregularity in the T-waves. Dr. Sanders subsequently arranged to transfer McKinney to The Ohio State University Medical Center (OSUMC), under the care of Thomas Gavin, M.D. Dr. Sanders testified that he spoke directly with Dr. Gavin to effect the transfer, but that he did not recall the specifics of the conversation. He also stated that a secretary or unit clerk would have sent a copy of McKinney's chart along with her, together with the results of any laboratory results that had been received. The UMH transfer sheet states that the purpose of the move was "further workup of [McKinney's] medical problems and possible dialysis." (Plaintiffs' Exhibit 5, Page 20.)

{¶ 4} McKinney arrived at the OSUMC emergency room at approximately 2:30 p.m. on November 7, 2005. According to Dr. Gavin, OSUMC did not receive any lab results from UMH, and its staff had no knowledge of the 7.4 potassium reading. He did not recall whether he had personally spoken with Dr. Sanders regarding the transfer, or whether it might have been another osumc staff member, and could not recall any specific facts concerning such conversation. Dr. Gavin testified that he was aware that McKinney's potassium level had been "elevated" according to the medical staff who referred her to OSUMC, but did not know what the number was or how high it was. He

---

[1]According to Dr. Sanders, the UMH laboratory defines "normal" as a reading of 3.5 to 5.0.

stated that he was also aware that McKinney had been given medications to reduce the level of potassium in her blood serum.

{¶ 5} In order to address the injuries associated with McKinney's falls, a CT head scan was ordered. Because her potassium level was in question, an EKG and a repeat blood test were also performed. The blood was drawn at 4:00 p.m., approximately four hours after McKinney's treatment at UMH. The blood test showed that McKinney's potassium level was at 5.3,[2] and the EKG depicted no abnormality in the T-waves. Dr. Gavin testified that the medications used to treat hyperkalemia were "temporizing measures" that would remain effective for only one or two hours and that, if her potassium had been "truly elevated" at UMH, by 4:00 p.m. the reading would have again been elevated. He also suggested that for the level to be at 5.3 approximately four hours after the medications had been administered, McKinney's potassium level may "never really [have been] drastically elevated." (Transcript, Page 69, Lines 12-22.)

{¶ 6} As a result of his findings, Dr. Gavin decided to transfer McKinney back to the custody of the Department of Rehabilitation and Correction (DRC), at its Corrections Medical Center (CMC) to obtain dialysis through their facilities and procedures. He testified that, "based on her presentation, her potassium was essentially within normal range for a dialysis patient. She did not appear to be fluid overloaded. I don't recall her being acidotic. We felt she did not meet the need for dialysis. We felt we had time to get her dialyzed." (Transcript, Page 58, Lines 7-13.) Dr. Gavin also testified that it was his understanding that McKinney "would be monitored there to be sure the potassium was okay," and that in order to make such a determination a blood test would be required. (Transcript, Page 72, Lines 9-10; Page 78, Lines 10-17.) He stated that OSUMC did not write orders for follow-up procedures because it was necessary to ensure that CMC could handle the patient upon transfer and, thus, any such orders are made through a direct communication, physician-to-physician. According to Dr. Gavin, the direct communication method allows CMC to refuse a transfer if it does not have the specific capabilities for the patient's care. (Transcript, Page 74, Lines 16-24; Page 76, Lines 10-16.)

---

[2]Dr. Gavin testified that a potassium level of 5.3 is "minimally elevated" but is not uncommon for a dialysis patient.

{¶ 7} William Jenkins, M.D., then an OSUMC second-year resident in emergency room medicine, made the physician-to-physician contact call and prepared the transfer certificate for McKinney's move to CMC. He testified that residents routinely complete the transfer documentation and that he had previously transferred many inmate patients to CMC. Dr. Jenkins explained that the procedure to request a transfer was to contact the on-call physician, "speak to them, basically reiterate the emergency department work-up, explain what [had been] done" and verify that CMC would accept the transfer. (Transcript, Page 119, Lines 21-23.) He stated that he had done so. Dr. Jenkins testified that he did not relate that McKinney had a 7.4 potassium reading at UMH, or provide any documentation of the same, because OSUMC did not have those records at the time. He stated that he had reviewed the paperwork regarding that information "after the fact," or in preparation for his trial testimony. Dr. Jenkins further testified that he "assumed" that a patient with a history of high potassium and a dialysis requirement would be followed up with continuous cardiac monitoring, either by a telemetry unit or an isolated monitor, and a repeat blood chemistry, but that he did not indicate the same on the transfer certificate. He also testified that he did not have the authority to write such orders for the CMC facility. The OSUMC transfer certificate, prepared at 5:26 p.m., states that the reason for the transfer was "hyperkalemia requiring dialysis, missed dialysis appointment today." (Plaintiffs' Exhibit 3, Page 146.)

{¶ 8} McKinney arrived at CMC at approximately 6:45 p.m. The CMC intake note states that she was "[s]cheduled for dialysis in A.M." (Plaintiffs' Exhibit 2, Page 152.) The first physician order, at 7:15 p.m., states "admit to CMC, [diagnosis] hyperkalemia." (Plaintiffs' Exhibit 2, Page 156.) The CMC medical admission record states that McKinney's diagnosis was "hyperkalemia requiring dialysis." (Plaintiffs' Exhibit 2, Page 151.)

{¶ 9} Nneka Ezeneke, M.D. was the on-call staff physician who took the transfer call from Dr. Jenkins. She testified that she recalled both being paged after working hours and the specific matters discussed. According to Dr. Ezeneke, she was advised that McKinney was an ORW inmate who had been sent to OSUMC with hyperkalemia, that she had been treated and stabilized, and needed to be transferred to CMC for

dialysis the next day. She stated that she was not told that McKinney would need another blood draw to determine her potassium level or that continuous cardiac monitoring would be required, and that she would not have accepted the transfer under those conditions because CMC did not have the facilities to perform such work. She also testified that she did not receive all of the details of McKinney's prior treatment and test results at the time she accepted the transfer. Dr. Ezeneke did not provide any aspect of McKinney's care while she was at CMC.

{¶ 10} Martin Akusoba, M.D., CMC's chief medical officer, testified that CMC is a skilled nursing facility that provides step-down care for inmate patients who are released from OSUMC. He stated that in McKinney's case, such care included observing her condition, regularly monitoring her temperature, blood pressure, heart and respiratory rates, and ensuring that she could be scheduled for dialysis the next day. He explained that CMC does not have the type of telemetry equipment that would be required to continuously monitor McKinney's heart, nor would such equipment be expected at a skilled nursing facility. He also stated that her potassium level would not have been monitored because CMC would have relied upon the 5.3 potassium reading taken at OSUMC, and the fact that she was being scheduled for dialysis the next day. Moreover, CMC did not have an after-hours laboratory to process the results. Dr. Akusoba did not provide any aspect of McKinney's care while she was at CMC.

{¶ 11} McKinney was not taken to dialysis with the first group of patients on the morning on November 8, 2005. There was some question regarding when, or if, she was scheduled for transport to Frazier Health Center, particularly because November 8 was a Tuesday, and not her regularly scheduled day for dialysis. According to Daniel Bauer, R.N., then floor nurse at the Frazier Health Center, the staff is frequently called upon to work a patient into the schedule. He testified that if McKinney had not been in preparation for transport to Frazier by 11:00 a.m., it was questionable whether she would arrive at the facility in time to be dialyzed before the facility closed at 5:00 p.m. However, he testified that if there were an emergent need for dialysis, a patient could be sent to OSUMC. (Transcript, Pages 177-179, 192-193, and 197-198.)

{¶ 12} On the morning of November 8, 2005, McKinney was seen by a CMC physician at approximately 10:00 a.m., when it was noted that she was alert and that

she denied chest pain, shortness of breath, abdominal pain, or "F/C." (Plaintiffs' Exhibit 2, Page 163.) At approximately 11:17 a.m., McKinney was found unconscious and without a pulse. (Plaintiffs' Exhibit 2, Pages 161-162.) Resuscitation efforts were commenced immediately and a "code blue " was called at 11:19 a.m. Within two minutes, at 11:21 a.m., McKinney's cardiac rhythm was restored. She was transported back to OSUMC via an emergency squad. McKinney never regained consciousness and died on November 14, 2005. (Plaintiffs' Exhibit 2, Pages 189-190.) Her death certificate, prepared following an external examination by the Franklin County Coroner's Office, lists hyperkalemia due to chronic renal failure as her cause of death.

{¶ 13} Plaintiffs assert that Drs. Gavin and Jenkins knew, or should have known, that McKinney had a potassium level of 7.4 while at UMH, that she had been given medications that would only temporarily lower that level, and that she was in need of emergent dialysis. Plaintiffs contend that Drs. Gavin and Jenkins misconstrued the significance of both McKinney's 5.3 potassium level and the T-wave reading taken at their facility, and that their negligent care of her was the proximate cause of her death.

{¶ 14} Plaintiffs further assert that DRC was negligent in failing to obtain adequate information concerning McKinney's medical condition before accepting her as a transfer to its facility, in failing to monitor her potassium level and heart condition while in its care, and in failing to recognize that her condition was life-threatening and in need of emergency dialysis on the morning of November 8, 2005. Plaintiffs contend that DRC's negligence was also a proximate cause of McKinney's death.

{¶ 15} "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, citing *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122, paragraph one of the syllabus.

{¶ 16} "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or

surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.

{¶ 17} The testimony of plaintiffs' experts, James E. Wood, III, M.D., who was board-certified in nephrology and internal medicine, and Joseph R. Yates, M.D., who was board-certified in emergency medicine, was presented by deposition.

{¶ 18} Dr. Wood opined that OSUMC's treatment of McKinney's hyperkalemia fell below the standard of care in that it was inappropriate to have discharged her on November 7, 2005, without first having dialysis. According to Dr. Wood, Dr. Gavin violated the standard of care in interpreting the 5.3 potassium reading as an indication that dialysis was not needed that day. Dr. Wood related that McKinney was given Albuterol, calcium gluconate, insulin, dextrose, and bicarbonate. He stated that "[f]our of those five drugs, all except the calcium gluconate, transiently lower potassium, and the effect wears off fully by, essentially, six hours. So the patient received appropriate temporizing potassium lowering therapies at [UMH].[3] And I would have expected, since they gave appropriate aggressive treatment, that the potassium level would have dropped to a level such as 5.3 later on at [OSUMC]. The thing that is clear is that the potassium level within a few hours after that 5.3 would have rebounded to a level of 7.4 or higher." (Deposition, Page 22, Lines 21-24; Page 23, Lines 1-13.) It was Dr. Wood's opinion that McKinney should have been considered an emergency patient requiring dialysis within at least six hours after the temporizing drugs were administered at UMH. (Deposition, Page 43, Lines 9-20.) He testified that, for a patient like McKinney, the danger inherent in having a 7.4 or higher potassium level was "[c]ardiac arrest, and short of that cardiac arrythmias, which could lead to cardiac arrest." (Deposition, Page 45, Lines 15-24.) In his opinion, the primary cause of McKinney's death was hyperkalemia, which then caused her cardiac arrest. (Deposition, Page 46, Lines 9-17.) Dr. Wood further opined, because McKinney was discharged to receive dialysis through

---

[3]All of the experts who testified agreed that the treatment provided by UMH was appropriate and complied with the standard of care, including transferring McKinney to OSUMC for possible dialysis. Additionally, all of the experts agreed that DRC complied with the standard of care in transporting McKinney to UMH for evaluation of her head and bodily injuries rather than to her regularly scheduled dialysis on November 7, 2005.

DRC's facilities, that OSUMC also fell below the standard of care in that the urgent need for dialysis at the earliest available opportunity was not effectively communicated to CMC.

{¶ 19} With respect to DRC, Dr. Wood opined that CMC's staff deviated from the standard of care in failing to obtain a repeat blood chemistry analysis and to perform cardiac monitoring throughout the evening of November 8 and into the next morning. He was further of the opinion that DRC's failure to assure that McKinney received dialysis early in the morning of November 8 fell below the standard of care. According to Dr. Wood, CMC's failure to recognize McKinney's life-threatening condition and to monitor it appropriately was also a proximate cause of her death. (Deposition, Page 46, Lines 9-17.)

{¶ 20} Dr. Yates testified only as to the care and treatment provided by OSUMC. He was also of the opinion that McKinney's immediate cause of death was cardiac arrest caused by hyperkalemia. (Deposition, Page 54, Lines 13-14.) Dr. Yates agreed with Dr. Wood that, in accepting the transfer of McKinney from UMH, the standard of care required that OSUMC physicians ensure that she receive treatment for her hyperkalemia in very short order, or within a matter of hours, if she were not to be admitted and dialyzed at OSUMC's facility. It was his opinion that the standard of care also required communicating instructions to CMC such that McKinney would receive high priority status for definitive treatment of her hyperkalemia within "a reasonable time." (Deposition, Page 85, Lines 5-11.) Dr. Yates defined such time-frame as including the morning after her transfer "if she could have a cardiac monitor and if she would be watched closely and be able to have a repeat potassium level some hours later to make sure she wasn't getting into trouble. And the next morning would be an unreasonable amount of time if she couldn't be monitored that closely or have her potassium followed." (Deposition, Page 87, Lines 9-17.) He concluded that the unreasonable delay in providing dialysis directly resulted in her death.

{¶ 21} In response to plaintiffs' experts, OSUMC presented the deposition testimony of Michael E. Yaffe, M.D., who is board-certified in internal medicine. Dr. Yaffe opined that the care and treatment provided to McKinney by OSUMC was proper and reasonable, and that such treatment complied with the standard of care.

(Deposition, Page 27, Lines 9-14.) It was his opinion that the temporizing medications that were administered at UMH would have lasted no more than two-three hours at the longest with Albuterol, a drug he characterized as not "generally demonstrating a lot of systemic effect" being the longest acting. (Deposition, Page 17, Lines 8-9.) Thus, according to Dr. Yaffe, McKinney's potassium level did not immediately begin to rise when the temporizing medications lost effect, but instead, "a new level of balance was achieved" by the time that blood was drawn at OSUMC. (Deposition, Page 82, Lines 1-7.)

{¶ 22} Based upon the 5.3 potassium level and normal EKG obtained at OSUMC, Dr. Yaffe opined that it was not below the standard of care to send McKinney back to CMC rather than admit her for dialysis at OSUMC's facility on November 7, 2005. Dr. Yaffe explained the basis for his opinion as follows: "this is a woman who has chronic kidney failure, chronic kidney disease, and was being treated with dialysis, and she had missed dialysis that day. People with chronic renal failure on dialysis tolerate these electrolyte changes certainly much better than someone who has an acute change in their electrolyte balance. So the hyperkalemia that was identified would have been far better tolerated in the patient with chronic renal disease than one who didn't have chronic renal disease. * * * she did not meet the criteria for acute dialysis. She wasn't in heart failure. She didn't have overwhelming metabolic acidosis. She didn't have overwhelming signs of pericarditis or other disturbances requiring acute dialysis. Therefore, delaying the dialysis to the next day after her potassium was re-measured and was found to be acceptable at 5.3, and in measuring her electrocardiogram as a mark of physiologic change of hyperkalemia, showing no T-wave abnormalities of hyperkalemia, that further supported that it was acceptable to return this patient to the dialysis center where she is known and has her [usual] dialysis." (Deposition, Page 28, Lines 1-24.)

{¶ 23} With respect to McKinney's cause of death, Dr. Yaffe testified that he was "unable to conclude that the cardiac arrest that occurred on the morning of November 8th was directly and proximately related to hyperkalemia." (Deposition, Page 42, Lines 10-12). Dr. Yaffe related that he had "reason to believe that [McKinney's] potassium problem had been mitigated and was under control on the night before, as evidenced by

the blood test obtained with a potassium of 5.3, and the normal electrocardiogram that was obtained at OSU. So, * * * the facts are, entering into this next morning, the potassium count was under control. * * * this woman [had] a number of co-morbid medical conditions, including heart disease with left ventricular hypertrophy, history of hypertension, past [illicit] drug use, including cocaine, diabetes. She had been a smoker, and therefore, other causes for an abrupt cardiac arrest as a primary cardiac arrhythmia, a cardiac arrhythmia related to heart disease, a possible myocardial infarction, all enter into the realm of possibilities, with none of these conditions reaching a greater than 51 percent probability, in my estimation." (Deposition, Page 42, Lines 14-24; Page 43, Lines 1-8.)

{¶ 24} With respect to the allegations against CMC, DRC presented the deposition testimony of Todd R. Wilcox, M.D., who is board-certified in urgent care medicine and holds an accreditation with the National Commission on Correctional Health Care. Dr. Wilcox testified that CMC's care of McKinney complied with the standard of care for a correctional health care facility.[4] (Deposition, Page 26, Lines 11-14.) He testified that the transfer of McKinney to CMC complied with the standard of care in that the "transfer was done in accordance with the rules for transferring patients. It was a physician to physician discussion. The treatment plan was laid out. The physician at the receiving facility was comfortable with the treatment plan and felt that they could meet the treatment plan goals, and there wasn't anything that was coercive about the treatment plan. There was no evidence of any sort of dumping of the patient." (Deposition, Page 28, Lines 17-25.)

{¶ 25} Dr. Wilcox also testified regarding whether the standard of care was violated when McKinney was transferred to CMC without first being dialyzed at OSUMC. He opined that "I think given the circumstances at the time of her transfer and the knowledge that was obtained as part of that decision making process, the transfer was within medical guidelines, and she didn't at that point have any evidence that she needed to be [dialyzed] imminently." (Deposition, Page 29, Lines 13-18.)

{¶ 26} When questioned as to whether it was within the standard of care for Dr. Ezeneke to have accepted the transfer of McKinney from OSUMC to CMC, Dr. Wilcox

opined that: "we have to remember what everybody's role is here, they [CMC] are a primary caregiver, and they are relying upon the specialists at the hospital to assist them with specialty care. So when you send a patient out, and they are evaluated by the hospital, you receive back the specialty recommendations from their wealth of physicians at the hospital who have collectively come up with a plan for the care of your patient. And so when you get a call from those physicians with the plan laid out -- and to be honest, this is the nicest discharge plan I have ever had. I wish they did this kind of discharge plan for my facility, because you rarely get that level of communication about a patient. And so this was done in an exemplary fashion with regard to the mechanics of the transfer." (Deposition, Page 31, Lines 12-25; Page 32, Lines 1-3.)

{¶ 27} With regard to whether McKinney's life would have been spared if she had been transferred for dialysis in the early morning hours of November 8, 2005, and the unequivocal statements of Drs. Wood and Yates that McKinney's cause of death was untreated hyperkalemia, Dr. Wilcox testified that: "[b]ased on the dearth of evidence in the chart with regard to causality, I don't think that any physician can make that statement to the level of being medically certain. She is a dialysis patient. That is kind of her baseline care. But since we don't know the cause of her cardiac event, and since there are multiple causes that are likely and happen all the time in patients that have cardiac events that are unrelated to dialysis, I don't think you can make that statement." (Deposition, Page 40, Lines 9-18.)

{¶ 28} Dr. Wilcox also explained that there were a number of medical issues faced by end-stage renal disease patients that can cause cardiac arrest or other serious medical episodes: "[e]nd stage renal disease patients are patients that face a lot of challenges. * * * They exist really as a result of their dialysis because that's what keeps them alive. And they really have a lot of problems over time because of the metabolic changes that occur as a result of the dialysis and how hard that is on their system. * * * They have limited physiologic reserve, and so stressors in their life can be much more significant for them than for many other patients. * * * And you can even have very minor stressors such as ground level fall, a small cold, things that don't tend to tip normal people over that can really be catastrophic for end stage renal disease patients

---

[4]It is undisputed that the standard of care for inmates is the same as that for non-inmate patients

because they just don't have the reserves physiologically to deal with that additional stress in their daily life." (Deposition, Page 38, Lines 17-25; Pages 391-10.) In short, Dr. Wilcox did not agree that cardiac arrest due to hyperkalemia was the definitive cause of McKinney's death.

{¶ 29} Upon review of all of the evidence, the court finds for the following reasons that plaintiffs have failed to prove their claims by a preponderance of the evidence. The evidence was insufficient to establish that either OSUMC or DRC deviated from the standard of care in their medical treatment of McKinney or that any treatment rendered by them proximately resulted in McKinney's death. Most significantly, the court is not persuaded that cardiac arrest as a result of hyperkalemia was the cause of McKinney's death and, thus, that OSUMC's failure to dialyze her at its facility, or that any delay on the part of OSUMC or CMC in effecting her transport from CMC to Frazier proximately resulted in her death.

{¶ 30} One of the initial issues in the case was whether information was properly communicated between UMH and OSUMC and between OSUMC and CMC. With respect to the former, it is clear that the lab report showing the 7.4 potassium reading did not reach OSUMC until after McKinney had been transferred to CMC. Additionally, Dr. Sanders' emergency room report containing that same information was not dictated or transcribed until after 6:00 p.m. on November 7, 2005. (Plaintiffs' Exhibit 5, Page 11-14.) Consequently, that information could not have been considered by OSUMC in rendering its treatment decisions. There is no explanation why the lab report itself was not sent with McKinney when she was transferred to OSUMC. Nonetheless, the preponderance of the evidence establishes that Dr. Sanders did communicate McKinney's health status with someone at OSUMC. Neither he nor Dr. Gavin recalled the specifics of the conversation between UMH and OSUMC. However, both Drs. Sanders and Gavin testified credibly and persuasively with regard to the nature of a physician-to-physician transfer and the type of information that is typically related. Moreover, Dr. Gavin testified that he was aware that McKinney's potassium level had been elevated and that she had been treated with temporizing medications. He further stated that his role was to "re-evaluate" McKinney or to evaluate "what we had at that

of health care facilities.

point in time." (Transcript, Page 51, Line 20 and Page 53, Lines 14-15.) Furthermore, both Dr. Gavin and Yaffe testified that it is the nature of a physician's role to question test results such as a 7.4 potassium level because test results can be flawed and an "abnormal" reading may be equally attributable to an error in the report as to the patient's health condition. In sum, there is no definitive answer as to what information was communicated to OSUMC, however, the court is persuaded that the information that was available was adequate, and any deviation from the standard of care in the communication process did not affect the outcome of McKinney's care at OSUMC.

{¶ 31} As to the communication of information from OSUMC to CMC, the court finds the testimony of Dr. Ezeneke to be more credible than that of Dr. Jenkins in that the court is persuaded that Dr. Ezeneke would not have accepted the transfer of McKinney had she known that continuous heart monitoring or a repeat blood test was required. However, having found that cardiac arrest as a result of hyperkalemia was not the cause of McKinney's death, any such deviation in the standard of care that the same represents on the part of Dr. Jenkins is immaterial to the outcome of the case.

{¶ 32} With respect to the cause of McKinney's death and any deviation from the standard of care on the part of OSUMC or CMC, the court finds the testimony of Drs. Yaffe and Wilcox to be more credible and persuasive than that of Drs. Wood and Yates. The court was not persuaded by Dr. Wood's testimony due in large part to his lack of familiarity with the medical records upon which he based his opinion. Dr. Yates testified that the obstruction in McKinney's coronary artery was "pretty close to hyperkalemia on the list of possibilities" for her death, (Deposition, Page 75, Lines 9-12) but that he ruled that out due to the coroner's report. It is well-established that "[t]he coroner's factual determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary. *Vargo v. Travelers Ins. Co.* (1987), 34 Ohio St.3d 27, at paragraph one of the syllabus. (R.C. 313.19, construed.) In this case, Dr. Bill Cox, an employee of Bradley Lewis, then Franklin County Coroner, conducted an "external" examination of McKinney's body, reviewed her medical records, and conducted toxicology tests, before determining McKinney's cause of death to be cardiac arrest due to hyperkalemia, due to chronic

renal failure, and hypertensive cardiovascular disease. (Transcript, Page 35, Lines 14-21; Page 36, Lines 19-22.) Although Dr. Cox tested vitreous fluid from McKinney's eye to determine her potassium level, the test was conducted on December 5, 2005, nearly one month after she coded on November 8, 2005. Dr. Lewis testified that the autopsy was conducted because "this woman was a member of the prison system * * * and had a history of trauma. And our concern was that this was not, in fact, a traumatic death, or that the head trauma had contributed to her death." (Transcript, Page 37, Lines 4-15.) The court finds that the results of the autopsy are not determinative or persuasive, and that Dr. Yates' opinions as to McKinney's cause of death are flawed as a result of his deference to such results.

{¶ 33} "In order to recover against a defendant in a tort action, plaintiff must produce evidence which furnishes a reasonable basis for sustaining his claim. If his evidence furnishes a basis for only a guess * * * as to any essential issue in the case, he fails to sustain the burden as to such issue." *Landon v. Lee Motors, Inc.* (1954), 161 Ohio St. 82, at paragraph six of the syllabus. In this case, the court finds that, for a woman in such poor health as McKinney, it is virtually impossible to determine a conclusive cause of death. However, the evidence establishes that McKinney was monitored in accordance with CMC's skilled health-care standards throughout the evening of November 7, 2005, and was examined by a physician at 10:00 a.m., on November 8, 2005, and found to be in no acute distress or exhibiting any signs of cardiac distress. The court finds that plaintiffs failed to prove either that OSUMC and CMC deviated from the required standard of care, or that any care rendered by them proximately resulted in McKinney's death. Accordingly, judgment shall be rendered in favor of defendants.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROBERT GORDON, Admr., etc., et al.

    Plaintiffs

    v.

OHIO STATE UNIVERSITY MEDICAL CENTER, et al.

    Defendants
    Case No. 2007-03471

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>


    This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendants. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


                        _____
                        CLARK B. WEAVER SR.
                        Judge


cc:


Anne B. Strait                    James E. Kolenich
Karl W. Schedler              9435 Waterstone Boulevard, #140
Assistant Attorneys General     Cincinnati, Ohio 45249
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Roger D. Staton
355 Summit Street
Lebanon, Ohio 45036

LH/cmd
Filed October 14, 2010/To S.C. reporter November 18, 2010